I will try to save a minute or two for rebuttal. Mr. Perea's arrest in this case was unlawful for at least two reasons. The first, that he was arrested without a warrant in the curtilage of his home, and the second, that the arrest, regardless of where he was arrested, was not supported by probable cause. Well, on the conditional guilty plea, he saved that. He saved the suppression motion. The motion was based on the causal connection between his arrest and the outflow of witnesses from that house when the agents had come out, and all these witnesses came out. Now, can you connect up the arrest with the production of this evidence? Yes, Judge Gershwin. I think I can. To begin with, I guess, a couple of points. First, the – assuming that there was an illegal arrest, which I trust the Court was at least problematic, yeah. Sure. Then, first of all, it would fall to the government to show that they – that any hint from the illegal arrest had dissipated. And the record here doesn't show that the government has met its burden in that regard. Well, what was the connection between the legality of the arrest of this man who came out of the house first and the evidence you wanted to suppress, which was all these people who came swarming out of the house? Well, it's – I think the record – I think, Your Honor, that what was done here is that the agents were, in fact, fairly clear about their intention to use Mr. Perea's arrest to essentially determine whether there were people in the house. And, in fact, they were – they said that fairly straightforwardly to Mr. Perea, and then again in court. They said, when they arrived at Mr. Perea's house, that they would arrest him unless he consented to a search of his house. And that was essentially – that was their purpose. The second – so what they did was, for approximately half an hour, they kept Mr. – well, let me get my back up. First thing they did is they arrived at the house. Mr. Perea, at that point, was still inside his house. They told him to come out. They told him that if he did not allow them to search the house, they would arrest him. They kept him there for about half an hour. And then, finally, when he – Part of that time was just waiting for the backup officers to show up, wasn't it? That's true, Your Honor, but only a matter of minutes, a minute or two, Your Honor. The second backup officer arrived. As I understand the facts, and we can – I want to confess, to begin with, that part of the difficulty for Your Honor – Your Honors, I trust, is that the district court found both Mr. Perea incredible in some respects and the officers not credible in some respects. But turning just to the uncontroversial testimony of the material witnesses themselves, what is – what seems – what is clear, what is unchallenged, is that the original material witness arrives. Mr. Perea is still in his house at this time. Mr. Trujillo, Officer Trujillo, takes the original officer. Then a second officer arrives almost immediately, takes that first material witness down to the sidewalk. And Mr. Trujillo remains – essentially tells Mr. Perea to step out of his house and holds him there for approximately half an hour while the agents develop a cordon around the house. What I – what I don't understand is if the court found that the place where the police officer was was curtilage, and the government agreed it was curtilage, and then the court seemed to require – which would mean that the police officer shouldn't have been there at all. And then the court seemed to impose an additional CATS-related expectation of privacy requirement. And I don't understand where that comes from. Your Honor, I have an idea. And I think that that is the essence of the error on this first point. That is, that the district court, and I think the government in their briefing, don't acknowledge a difference in the standard between search and seizure. So, for example, there is a line of cases that says that if you have your windows drawn in your house and somebody, a police officer, walks through on the street, they see into your house, you can't complain that they searched inside your house because you hadn't closed the windows. On the other hand, that same rule does not permit the officers thereafter to enter your house without a warrant to seize it. And so what happened here is the district court, I think, primarily relying on the Pineda-Moreno case, which had said, when you're conducting a search of the curtilage, if the curtilage is exposed to the viewer, the person can't complain that he didn't have a reasonable expectation of privacy, imported that same theory into a seizure context where it doesn't make the same sense. Because... Isn't... When you... You focus on the legality of the arrest, as Judge Goodwin was suggesting. And isn't that really a false argument? Because if you make an argument about false arrest, then you have to connect up the, under the exclusionary rule, what was discovered. Isn't your better argument, or isn't this the correct argument, that the officer had no right to be there in the first place? That's, I think, what Judge Wardlaw is saying, is that if that's in the curtilage, then the officer has no right to be there. Because the fundamental question is, whenever he yells into the crowd, the fundamental question is, does he have a right to be there at that moment? It has nothing to do with the arrest. It has to do with curtilage and the right to be there. I think the Court is absolutely right. And we do make that argument in our briefs. We certainly made it at the district court. Perhaps what the Court's hearing is some of my best guess at what interests the Court this morning. I do think, though, that that point, I mean, all of these arguments, in some sense, share the same question. Whether or not the officers were entitled to enter the curtilage of the home to search, you know, at all at this. And our position has always been that they were not. But doesn't it really become a little bit more confusing when, in fact, the officer is essentially chasing somebody for whom he has probable cause to believe is an accomplice? Does that mean that he can actually follow Mr. Garcia, but then he has to stop when he gets into the curtilage of someone else? I don't think so, Your Honor. In some ways, I wish that were the rule. But I don't think it can be. I think what the rule can be, though, is that hot pursuit has to be limited by its, you know, by its intention, by its purpose. The government didn't argue. I mean, that's the other weird thing about this case. The court found there wasn't exigent circumstances like the guy, the person he was chasing would get away. Right. Actually, what the police wanted in this case was for him to get into the house so that they would have a reason. They suspected he was going to a place where illegal aliens would be hidden and harbored. I'm interrupting, Your Honor. Right. But that's exactly right. And they were clear from that from the beginning. Essentially, what they had, just for whatever reason, so they had, at the moment they arrived at this house, knowledge that somebody had come from the border to the house. And they had no idea if anybody else was in the house. They had no idea anything about this particular house from any previous investigation, no notion of about Mr. Perea. And as they kept this gentleman on the street for half an hour and presumably talked to him during that time, no additional information developed during that time that would allow them to believe that there was any reason to think that there was anything going on in this house. Well, if the if the officer sees the man climb over the fence, sees him get in the taxi cab, follows the cab to the house and then Garcia follows Garcia into the curtilage, what is why isn't that just a crime scene? And he's just going in there to get Garcia and whoever else turns up inside the house. But it wasn't the arrest or the entry into the curtilage that produced the evidence that you asked the court to suppress. It was the it was the people swarming out of the house. And Garcia had already been apprehended. And they had a right. Didn't they have a right to take him away at as soon as they caught him in the in the premises? Well, you just followed him right in. If I think I think the court has sort of I guess the court has sort of asked me three questions. If Garcia had been going into, say, a service station to rob the service station and an officer followed him in and arrested him while he was attempting to rob the service station, what's why is that a a violation of the of the curtilage? Well, certainly a service station doesn't have a curtilage, so that's that's one distinction. A second distinction is is the one that Judge Wardlaw made, that is that there was no apparent fear. There was no apparent reason to believe that that it was necessary, that there was any exigency, there was any reason to arrest him under these circumstances. The court found that. Yeah, more significantly was the district court found that and the government didn't argue that. So in this circumstance, and I find troublesome in this circumstance, is that one officer could have just sat out there while Garcia is in the house while someone else gets a warrant for the arrest. If exigent circumstances were to arise at that point, then, you know, perhaps intrusion into the home would have been OK without the warrant, but there didn't seem to be any reason why, at least anything found, why they couldn't have gotten the warrant. I mean, that was exactly even for his testimony. But I think what Judge Goodwin's concerned about, and it is I think it is an important concern, is that what is it that you want to suppress? Oh, we want to suppress the the the human evidence that was discovered as a consequence of those invasions. So the first four, was it the first four, just the first four that came out or? We suppress all of them, but as it turns out, the way the record works out, it doesn't much matter because the government indicated they wouldn't use it. If that's what you want to suppress, though, then what you need to be arguing is that the unlawful intrusion into the curtilage is what caused that evidence to happen. And I suppose you would argue that because the police didn't this wasn't a police knock on the door case. This was a Garcia knock on the door. And then the police taking action from a place where this I'm just trying to help. I appreciate that. There has to be some causation between the sitting intrusion into this sphere of the home and the evidence you want to suppress. I think that's right. You know, I want to answer the court's question. I do see I'm out of time. But the causation, I've tried to articulate the causation, perhaps not elegantly. The thing is that this this the people came out of this house because essentially the police officers moved into the curtilage. They detained the owner for half an hour. They moved him out of the house. They were they were moving. The aliens knew that they were moving around. It's a constitutional violation that produced the evidence you want suppressed. At a minimum, there are we've nominated several. Certainly the intrusion into the curtilage is one. The aliens were able the aliens. I'm sorry. The people in the house saw that these people with radios were in the curtilage and that they were detaining and moving away the person. That was certainly relevant. If they had been walking down the street yelling, everybody come out of their house. Certainly no reason to believe that that everybody, everybody would have. These were hiding. These are people who are hiding. So certainly the better practice would be to get a warrant in this case. And as I say, Judge Ruhio testified that the better practice, the ordinary practice would have been to get a warrant. But in this case, he didn't want to get a warrant. He wanted to search the house without a warrant. So he essentially did that. He arrested my, he arrested my client and then he ran and he yelled, told everybody to get the house and then he searched it. I just want to make sure that that you didn't acknowledge something which waves your, um, illegal arrest argument. I think what you said was he comes in, he conducts the arrest and over the next half hour learns nothing from the defendant. Um, as a result, there is no, and when he decides to knock on the door, that's not a product of the illegal arrest because he learned nothing. And the agent learned nothing from the arrest, the better. So essentially that's why arrest is a false argument because nothing, the exclusionary rule doesn't apply because there's nothing that happened from the arrest. It is more a question as to whether or not the agent had a right to be there at that particular location when he ordered people out of the house, I think. And when you said he learned nothing from the discussion, are you essentially suggesting that really the illegal arrest is not important here? Well, what I meant to say, he didn't learn anything from Mr. Perea, Your Honor, but he also didn't learn anything from the other alien that they had brought to the street, which I thought that I was intending to refer to. So no additional probable cause was developed from their interview of Mr. Garcia, who they had removed to the streets and had in a car for a half hour. So during that time, with respect to whether or not the, the, the arrest, uh, is irrelevant, I, I take the Court's point. Certainly I, certainly that, that is a, that is a winning argument for me and I, and I endorse it. With respect to the, uh, whether or not the, the arrest had any effect, I believe that it, that the Court could plausibly conclude that one thing the, that led the aliens to come out when they were, when they were yelled, yelled at, not just, was not just the fact that the people were in the curtilage up against the house with their walkie-talkies, uh, conspicuously Border Patrol officers, but, but that they had, they had previously demonstrated their willingness to exercise their authority as such by removing the owner of the house to, to the sidewalk. Uh, and that, that was, uh, I think, an additional thing that, that certainly someone could have considered, uh, uh, as, as leading to the, um, to the, the evidence. Thank you. Christopher Tenorio for the United States. May it please the Court. There's a few issues I think that need, um, clarifying, both relating to the facts and, and as the two legal issues kind of coincided, uh, addressing Judge Wardlaw, you said that wouldn't it have been better to have a warrant? Clearly it would always be better to have a warrant, but it was not required in this case. The first agent that followed Mr. Garcia to... Isn't a warrant always required when there's an intrusion into the curtilage? No, Your Honor. It is not. In this particular case, a law enforcement agent may enter a curtilage to perform a knock and talk and conduct further investigation. It's exactly what happened here. They entered the curtilage. Oh, was, is it? Really? Did the, did the agent knock on the door? He, he, he came to the door simultaneously with Mr. Garcia. He was right behind him. His intent wasn't to knock and talk, was it? I, there was no finding on what his intent was. He didn't testify that he was going to perform a knock and talk, did he? He did not, Your Honor. Okay. So how can you tell me that's what this was? I'm saying that it's permissible for a law enforcement officer to enter the curtilage to do that, to do that type of investigation. Right. I know we have a case that says you can knock and talk, but that's not what happened here. What he did do is he, uh, the court found that he asked Mr. Perea to come outside for, for questioning. After someone else knocked and talked while he was inside the curtilage. And the question is, was he lawfully inside the curtilage? There was nothing to say that there was no, no evidence that Mr. Perea had prevented him from entering the curtilage or anyone from the public from entering the curtilage. The district court specifically, specifically found that the gate walking, um, leading up to the front door was unlocked. Right. So here, I have a picture of this and it's a picture, not at the time. This is one of your exhibits, I guess, exhibit when this was taken later. Is this your exhibit? Yes, it is. Okay. Only the gate was closed in front of the carport, right? Well, there are two gates. Right. I know the gate that goes in front of the carport. Correct. Which is where the officer followed, um, Garcia into. No, that's not correct. There was a gate that was closed. He followed him through the gate leading up to the front door. So I think we're on the same page here, that this gate, which looks open in this picture, was closed at the time. And then there was a gate that led to the doorway, which the officer could go through to go knock and talk on that door, right? Yes. That, um, the question is whether the officer, uh, not limiting himself to this front door and knocking and talking and going over to the place where there was, where it was gated and the door there was inside 15, he said 15, the testimony was 15 feet back, whether that was lawful for him to go all the way in there without a warrant. It wasn't, you have it exactly correct except for one point. It wasn't 15 feet back. It was 15 feet from the front door. And if you look at the next exhibits, you'll show that that, that door under the carport was almost immediately there at the entryway of the carport. Does it? Well, I'm not, I don't know what you mean by almost immediately. It is exhibit number two. No, um, exhibit three B. Inside exhibit number three, the one at the bottom, you'll see the screen door immediately on the left as you entered the archway. Oh, that's just, that's, that's because that's, that picture was taken from the front of the archway, whereas if you look at exhibit two, you can see, wait, yeah, this exhibit two, it looks like more like three or four feet back. Three or four feet. That, that's, that's about right. But you have to go, you have to go into the carport. You have to go into the carport to knock on the door or to talk to somebody. And you acknowledge that that's the curtilage. Yes, that's right. And, and Mr. Perea also said that that not only was that possibly was necessary because the front door did not open and this court said that even. That's irrelevant to what a police officer is supposed to do. The police officer could knock and talk at that front door. I will agree with you a hundred percent on that, but the Supreme Court has said that the curtilage is your home and a police officer can't intrude into your home without a warrant or exigent circumstances or whatever. Correct. And this was not entering into the home. And it was not an area that Mr. Perea had made any efforts to keep private. He has, he stepped right outside the door that was clearly visible from the, the sidewalk and right there by the door. Now, this court has also said that if the, that the law enforcement officer is not precluded from going from the front door to another entrance, if it's necessary to question that the occupants inside. I don't understand how you can say this wasn't a place that he made no effort to keep private. He had a gate locked in front of it, the carport area. But as the district court found, the gate was not locked walking up to the front of the house. That's a different gate. That's correct. But it was the distance from the front door to there was clearly available for anyone in the public. In fact, Mr. Garcia showed how easy it was to walk from the front door in there. And there'd been no effort to, to impede that process. And the gate was clearly open. The district court said it was, it made a difference that that gate was open. He clearly looked at that issue. There was no mailbox on the outside of the gate that said no one in the public could come to the house. There was nothing else. The court also compared it to an open garage door, which would not have fourth amendment protection because it's exposed to the public. This was even more exposed because there was no way to close and shield that. Finally, the gate itself is clearly visible. It's not very high. The court made specific findings on the distance between the rods and how you could look through it. Don't even need to stand on tiptoes to look inside. So it was not shielded. Now, Mr. Perea asked for a bright line rule that just by simply stepping within a couple of feet of the house, that he's, he's allowed fourth amendment protections automatically because it's the curtilage. And this court and the Supreme court have never decided that. The distance from the house is certainly a factor, but the most controlling factor, according to Dunn, is whether there are privacies that, that are kept within that house, where it would have been in the backyard or a higher findings of district court made are contrary to your saying. I mean, the district court said, and I, when I look at the photos, I tend to agree with him that when you looking from at the photo, looking into the car port, he's the district court said, frankly, it's too dark. I can't see the door. I'm having a hard time seeing it. That's because it was protected. It was hard to see in there. And in addition, um, uh, the defendant had, he had tools, valuable tools, other things that he would not want open to the public, you know, possibly be stolen in that area, along with his, um, 1970 GMC truck, which was a valuable truck that he was working on. I mean, there's so much evidence here that goes contrary to your, your argument that it's, that this was like an open public place that he had, he didn't have an expectation that it was a private place. Well, I think there's clearly a difference between whether someone's allowed into a curtilage to take property that's there and someone that can see into a curtilage as to what is there. Uh, for example, if you can see the car, you can see the tools. If he was to see marijuana plants, that's clearly within plain view. And although the curtilage is exposed to the public, someone could, a law enforcement officer passing by can clearly look inside. The, the cases have certainly protected burglary of a person's home where they go into the curtilage and steal something. But the point here is what they're able to see and what is exposed to the public. And Mr. Perea made no efforts to, to shield that from the public. There are many things he could have done. It is pretty clear though, that you are not arguing that the officer had the right to follow Mr. Garcia because Mr. Garcia was suspected of being, um, illegally in the country. That's not the basis of your argument. The basis of your argument is just related to Mr. Perea. Well, it is at the beginning. You're correct. We did not make that argument that he was following it, but what had happened subsequent to that, no reasonable suspicion was necessary for him to enter the curtilage and ask questions. However, when Mr. Perea came out, there was certainly reasonable suspicion based on following the alien to that house, speaking on the phone and taking the taxi. And that permitted the temporary detention and further questioning, which eventually led to a probable cause. And I think there's a couple of important points to point out that Mr. Perea assumes that the request for others to come out of the house happened after he was arrested. And there is no place in the court, in the record that that in fact occurred. In fact, to the contrary, the district court finds that there was no custodial interrogation, therefore implying that he was not in custody. The two agents, uh, testified that Mr. Perea was there when the knock and talk occurred. And the only issue regarding credibility was that the agents were confused regarding the number of aliens in the house, not regarding what they saw. And in fact, the district court said that Mr. Perea was completely non-credible at that point. And he said to the credibility of the agents. I appreciate that. I just, I'm trying to figure out exactly what your argument is about why Trujillo could be standing at the door when he ordered people out. And what you're saying, I think is Mr. Garcia is irrelevant. He was not following Mr. Garcia. That's not, that's not important. He was there for a knock and talk, essentially that put him there. Uh, and that's it. That's your argument. That is your honor. A, that is the primary thrust of the argument. And I think that's what the district court found because it said the knock and talk or the, the announcement into the house was completely incidental to the arrest whenever that may have occurred. And that's why it was not contingent, even if it was an unlawful arrest, which we argued it was not, it had nothing to do with, with the, the, the announcement into the house. So yes, Mr. Perea could not have even, um, come to the door, may not have even been present. The agent still could have gone up and announced it to the house. Please everyone come out. And I see that my time is up. So I, I thank you and submit. All right. Um, yes. Versus Prea Ray to be submitted. We've already submitted, um, Singh versus Holder on, on the briefs and we'll take up Milton Green archives versus, uh, Marilyn Monroe LLC.
judges: Sessions, Goodwin, Wardlaw